68 F.3d 1169
 64 USLW 2278, 95 Cal. Daily Op. Serv. 8189,
95 Daily Journal D.A.R. 14,080
 Katherine SABELKO and Nancy Barto, Plaintiffs-Appellees,
v.
The CITY OF PHOENIX, Skip Rimsza,* in his
official capacity as Mayor of the City of Phoenix, and
Thelda Williams, Frances Emma Barwood, Craig Tribken, John
Nelson, Kathy Dubs, Salomon F. Leua, and Calvin C. Goode, in
their official capacity as members of the City of Phoenix
City Council, Defendants-Appellants.
 No. 94-15495.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted June 13, 1995.
Decided Oct. 19, 1995.
 
 Marvin A. Sondag, Assistant City Attorney, Roderick G. McDougall, City Attorney, and Paul W. Badalucco, Assistant City Attorney, Phoenix, Arizona, for defendants-appellants.
 Benjamin W. Bull, American Center for Law and Justice, Phoenix, Arizona, for plaintiffs-appellees.
 James Weinstein, Tempe, Arizona, for amicus Arizona Civil Liberties Union.
 Roger K. Evans, Amicus Curiae Planned Parenthood Federation of America, New York City, and Lawrence J. Rosenfeld, Helen R. Holden, and James W. Armstrong, Sacks Tierney, Phoenix, Arizona, for amicus curiae Planned Parenthood of Central and Northern Arizona, Inc.
 Joan R. Gallo and George Rios, Assistant City Attorneys, San Jose, California, amici curiae in support of defendants-appellants.
 Appeal from the United States District Court for the District of Arizona.
 Before: SCHROEDER, BEEZER, and THOMPSON, Circuit Judges.
 SCHROEDER, Circuit Judge:
 
 
 1
 In response to rising protest around abortion clinics in Phoenix, Arizona, the City Council in November of 1993 passed an ordinance regulating the conduct of demonstrators in public areas within 100 feet of health care facilities. Known as the Phoenix "bubble" ordinance, the law makes illegal a demonstrator's failure to honor a person's "clearly communicated request" to withdraw to a distance of eight feet from the person if the demonstrator is in a public area within 100 feet of a health care facility.[1]
 
 
 2
 Six days after Phoenix enacted the ordinance, plaintiffs Katherine Sabelko and Nancy Barto filed suit in federal court pursuant to 42 U.S.C. Sec. 1983 seeking declaratory and injunctive relief against the City on the ground that the ordinance violated their First Amendment rights. The plaintiffs describe themselves as antiabortion sidewalk counselors who distribute literature in front of Phoenix clinics and attempt to engage others in peaceful conversation about alternatives to abortion.
 
 
 3
 The district court granted the injunction and the city now appeals. Appearing amici curiae in this action in support of the City are Planned Parenthood of Central and Northern Arizona, Inc. and the City of San Jose writing on behalf of 32 other California cities. In support of the plaintiffs-appellees is amicus Arizona Civil Liberties Union (AzCLU).
 
 The District Court Decision
 
 4
 The district court's preliminary injunction preventing enforcement of the ordinance rested upon no disputed issues of fact. The district court ruled as a matter of law that the ordinance violates the First Amendment, and all issues on appeal to this court are presented for our de novo review.
 
 
 5
 The district court ruled the ordinance unconstitutional on four principal grounds which we summarize as follows:
 
 
 6
 1. Because the ordinance regulates "protest," but not supportive speech, and because it gives private citizens the authority to silence speech, the district court ruled that it was viewpoint discriminatory.[2]
 
 
 7
 2. The court ruled the ordinance overbroad because, in the district court's view, it effectively bans handbilling within the 100-foot area.
 
 
 8
 3. Ruling the ordinance vague, the district court found insufficiently clear meaning in the phrases "clearly communicated request" to withdraw and "demonstration activity."
 
 
 9
 4. Finally, the district court rejected any analogy between the privacy interest infringed by demonstration activity targeting a home, as recognized in Frisby v. Schultz, 487 U.S. 474, 108 S.Ct. 2495, 101 L.Ed.2d 420 (1988), and that affected by activity targeting a health care facility. The district court held that the principles applicable to free speech in a public forum as enunciated in Perry Education Ass'n. v. Perry Local Educators' Ass'n., 460 U.S. 37, 45, 103 S.Ct. 948, 955, 74 L.Ed.2d 794 (1983), control demonstration activity outside health care facilities.
 
 The Madsen Decision
 
 10
 The district court's injunction was entered on February 11, 1994. The Supreme Court's subsequent decision in Madsen v. Women's Health Center, Inc., --- U.S. ----, 114 S.Ct. 2516, 129 L.Ed.2d 593 (1994), guides our review and controls our opinion today.
 
 
 11
 In Madsen, the Supreme Court considered the validity under the First Amendment of a Florida state court injunction against named individual antiabortion protesters and persons acting in concert with them. The Court upheld the establishment of a 36-foot "buffer zone" around an abortion clinic in Melbourne, Florida. Within the buffer zone, the defendants were prohibited from demonstration activity of virtually any kind. The Supreme Court ruled that the injunction was content neutral despite the fact that it targeted only abortion protesters.
 
 
 12
 We can find no basis for holding the Phoenix ordinance less content neutral than the Florida injunction. That injunction prohibited the defendants from "congregating, picketing, patrolling, demonstrating or entering" within 36 feet of the clinic. Quoting Ward v. Rock Against Racism, 491 U.S. 781, 791, 109 S.Ct. 2746, 2753-54, 105 L.Ed.2d 661 (1989), the Court held that the "principal inquiry in determining content neutrality is whether the government has adopted a regulation of speech 'without reference to the content of the regulated speech.' " Madsen --- U.S. at ----, 114 S.Ct. at 2523. The Florida injunction passed this test, the Supreme Court said, because "none of the restrictions ... were directed to the contents of th[e] petitioner's message." Id. The Phoenix ordinance, like the Florida injunction, makes no reference to the content of the speech it purports to regulate. The Supreme Court's ruling in Madsen thus forecloses the plaintiffs' contention that the Phoenix ordinance is viewpoint based.[3]
 
 
 13
 In Madsen, the Court announced that an injunction is subject to more rigorous scrutiny than is a generally applicable ordinance. To survive appellate review, the injunction must burden "no more speech than necessary to serve a significant government interest." Madsen, --- U.S. at ----, 114 S.Ct. at 2525 (citing NAACP v. Claiborne Hardware Co., 458 U.S. 886, 916, 102 S.Ct. 3409, 3427, 73 L.Ed.2d 1215 (1982)). The Court explained that the standard is more lenient in cases such as this where we review an ordinance of general applicability. See Madsen --- U.S. at ---- - ----, 114 S.Ct. at 2524-25. In contrast to an injunction, a content neutral, time, place and manner restriction in an ordinance survives First Amendment scrutiny if it is "narrowly tailored to serve a significant governmental interest, and leave[s] open ample alternative channels of communication." Perry, 460 U.S. at 45, 103 S.Ct. at 955 (citations omitted). The dissent urges a more stringent standard for an ordinance than an injunction. In Madsen, Justice Stevens propounded the same view but the majority expressly rejected it. Madsen at ----, 114 S.Ct. at 2525. We are bound by the majority.
 
 
 14
 The Court held in Madsen that the injunction survived scrutiny under the more rigorous standard because it burdened no more speech than necessary to serve significant government interests. The Court focused on several such interests that the Phoenix ordinance likewise serves. These include a woman's right to abortion and other pregnancy-related treatment, see Roe v. Wade, 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973), as well as the state's interest in public safety and order, including street and sidewalk traffic control, see Madsen, --- U.S. at ----, 114 S.Ct. at 2526. The Madsen Court agreed with the Florida Supreme Court that "the state's strong interest in residential privacy, acknowledged in Frisby v. Schultz, 487 U.S. 474, 108 S.Ct. 2495, 101 L.Ed.2d 420 (1988), applied by analogy to medical privacy," Madsen at ----, 114 S.Ct. at 2526. The Court approved the Florida court's view that just as targeted picketing of the home threatens the psychological well-being of a "captive" resident, targeted picketing of a hospital or clinic threatens the physical and psychological well-being of a patient held "captive" by medical circumstance. See id. (citing Operation Rescue v. Women's Health Center, Inc., 626 So.2d 664, 673 (Fla.1993)).
 
 
 15
 The Supreme Court's decision in Madsen thus undermines the pillars supporting the district court's ruling that the ordinance is unconstitutional. Under the standard announced in Madsen, the ordinance is not viewpoint discriminatory, but is content neutral. It is a time, place and manner restriction that serves several significant state interests. Under Madsen, it is not violative of the First Amendment if it is narrowly tailored to serve those interests and leaves open ample alternative means of communication. See Perry, 460 U.S. at 45, 103 S.Ct. at 955. The provisions of the ordinance challenged in this case are no more vague than those of the injunction in Madsen. Finally, the Supreme Court in Madsen expressly recognized that persons approaching a health care facility represent a "captive audience," thus rejecting the position of the district court in this case that a public area adjacent to a health care facility must be considered, for all purposes, an open forum.
 
 
 16
 Appellees' principal contention on appeal is that the ordinance is overbroad and not sufficiently narrowly tailored. They contend that by permitting "any person" to ward off a demonstrator, the ordinance curtails too much speech. They argue that to survive scrutiny, the ordinance must permit only patients seeking health care services to terminate unwanted confrontations and face-to-face communications.
 
 
 17
 The problem the city faces is that such narrowing would compromise the very privacy interests the ordinance was meant to protect. The approach appellees suggest would require a woman to identify herself as a patient seeking pregnancy-related services in order to terminate an unwanted confrontation. Moreover, by preventing the parent or partner of a young or sick patient from invoking protection on her behalf, the narrowing that appellees advocate would tend to leave exposed to the most persistent demonstrators those least capable of declining to receive their message.
 
 
 18
 The appellees, amicus AzCLU and the dissent express concern about the possibility that under this ordinance, escorts or others who may have no relationship whatever to the patients may create a zone around a patient even larger than the eight feet contemplated by the ordinance. They suggest, for example, that an escort might repeatedly invoke the "bubble" while advancing toward a counselor beyond eight feet from the patient. The parties provide little basis for assessing how likely such a scenario may be. We nevertheless observe that as the distance between the escort and the patient increases, so does the ability of other counselors to approach the patient. Appellees offer no alternative provision that would adequately protect the city's concerns and avoid the theoretical possibility that escorts might inflate the "bubble" zone the city contemplated.
 
 
 19
 In support of their overbreadth position, appellees and our dissenting colleague point us to another portion of the Madsen disposition which they incorrectly assert is dispositive of the issues before us. The Court in Madsen struck down as overbroad a provision of the injunction that drew a line of 300 feet from the facility and barred "all uninvited approaches of persons seeking the services of the clinic regardless of how peaceful the contact may be" within that area. Madsen, --- U.S. at ----, 114 S.Ct. at 2529. This injunctive ban the Supreme Court termed a "consent" requirement. The Court held it burdened more speech than necessary to prevent intimidation and ensure access.
 
 
 20
 The ordinance in question here has no such bar against uninvited approaches. It permits any approach to any individual until the individual affirmatively requests a disengagement. Moreover, there is no limitation on approaches beyond a 100-foot line, whereas the Madsen line was 300 feet. Finally, once the "bubble" is invoked, communication is not prohibited or interrupted, but simply distanced to eight feet. For these reasons we hold that the ordinance is narrowly tailored to serve significant interests. For similar reasons, we conclude that it also allows ample alternative means of communication. Contrary to the claims of appellees and the dissent, there is no bar to signs, placards, or pictures. Counselors can handbill and approach anyone outside the 100-foot barrier, and anyone within the 100 feet until and unless that person objects. The First Amendment protects the right of a prospective recipient of a handbill to refuse the communication as well as the right of the prospective communicant to offer it. Martin v. Struthers, 319 U.S. 141, 63 S.Ct. 862, 87 L.Ed. 1313 (1943); Schneider v. State, 308 U.S. 147, 60 S.Ct. 146, 84 L.Ed. 155 (1939).
 
 
 21
 The JUDGMENT OF THE DISTRICT COURT IS REVERSED AND THE MATTER REMANDED WITH INSTRUCTIONS TO VACATE THE INJUNCTION.
 
 
 22
 BEEZER, Circuit Judge, dissenting.
 
 
 23
 By voice, pamphlet or placard some citizens of the United States are actively engaged in a vigorous debate on the sidewalks, streets and other public places adjacent to health care facilities located in cities and towns across the country. The debate is also heard in the nation's capitol.[1]
 
 
 24
 Unlike the Senators who are given a privilege on the floor of the Senate, the citizen demonstrators in this case claim a right to free speech protected by the First Amendment. So it is that I address the question whether speech incident to demonstration activity in the vicinity of health care facilities may be proscribed by city ordinance.
 
 
 25
 The City of Phoenix enacted Ordinance No. G3705 requiring any person engaged in demonstration activity within 100 feet of a health care facility to withdraw at least eight feet away from any person who requests it. Because I believe the ordinance is not narrowly tailored and overly burdens protected speech, I respectfully dissent.
 
 
 26
 * In 1993, due to concerns about harassment outside health care facilities, the City of Phoenix enacted an ordinance limiting "demonstration activity" near such clinics. The ordinance in effect allowed individuals within 100 feet of all designated facilities to create a "bubble" around themselves. The ordinance requires all persons engaging in "demonstration activity" to withdraw a distance of eight feet when requested to do so. Specifically, the ordinance provides:
 
 ORDINANCE NO. G3705
 
 27
 AN ORDINANCE AMENDING CHAPTER 23,
 
 
 28
 ARTICLE 1 OF THE PHOENIX CITY CODE, BY ADDING SECTION 23-10.1,
 
 
 29
 RELATING TO UNIMPEDED ACCESS TO HEALTH CARE FACILITIES;
 
 
 30
 AND DECLARING AN EMERGENCY.
 
 
 31
 WHEREAS, unimpeded access to health care services is critically and uniquely important to the public health, safety and welfare; and
 
 
 32
 WHEREAS, persons attempting to access health care facilities are subject to harassing or intimidating activity tending to impede their access to those facilities by demonstrators approaching within extremely close proximity; and
 
 
 33
 WHEREAS, such activity near health care facilities creates a "captive audience" situation where persons seeking services cannot avoid the area outside the facilities, and their physical and emotional conditions may make them especially vulnerable to the adverse physiological and emotional effects of such harassing or intimidating activities directed at them from extremely close proximity; and
 
 
 34
 WHEREAS, such activity in extremely close proximity tends to undermine a person's right to privacy and interference with a person's right to seek legitimate health care treatment and counseling; and
 
 
 35
 WHEREAS, this ordinance does not preclude all protesting, picketing, demonstrating, leafleting [sic] or educational activities near a health care facility but is a necessary time, place and manner restriction intended to reconcile and protect the First Amendment rights of demonstrators and the rights of persons using health care facilities to be free from direct confrontation, hindrance, harassment, intimidation and harm; and
 
 
 36
 WHEREAS, existing law does not adequately protect such access to health care facilities; NOW THEREFORE,BE IT ORDAINED by the Council of the City of Phoenix as follows:
 
 
 37
 SECTION 1. Chapter 23, Article 1, Phoenix City Code, is amended by adding section 23-10.1 to read:
 
 
 38
 Sec. 23-10.1 IMPEDING ACCESS TO HEALTH CARE FACILITIES.
 
 
 39
 A. It is unlawful for any person, in the course of demonstration activity within the access area of a health care facility, to fail to withdraw upon a clearly communicated request to do so to a distance of at least eight (8) feet away from any person who has made the request.
 
 B. For purposes of this section:
 
 40
 1. "Access area" means any portion of a public street or other public place or any place open to the public within one hundred (100) feet of an exterior wall or entryway of a health care facility.
 
 
 41
 2. "Demonstration activity" includes but is not limited to protesting, picketing, distributing literature, attempting to impede access, or engaging in oral protest, education or counseling activities.
 
 
 42
 3. "Health care facility" means any hospital, clinic, office, building or other place used to provide medical, psychological, nursing or other health care services, including family planning counseling and pregnancy-related services.
 
 
 43
 C. For purposes of this section, distance shall be measured from that part of the closest demonstrator's body that is nearest to the closest part of the requesting person's body. The term "body" includes any natural or artificial extension of a person's body including but not limited to an outstretched arm or a hand-held sign.
 
 
 44
 SECTION 2. WHEREAS, the immediate operation of the provisions of this ordinance is necessary for the preservation of the public peace, health and safety, an EMERGENCY is hereby declared to exist, and this ordinance shall be in full force and effect from and after its passage by the Council as required by the City Charter and is hereby exempted from the referendum clause of said Charter.
 
 
 45
 PASSED by the Council of the City of Phoenix this 17th day of November, 1993.
 
 
 46
 Katherine Sabelko and Nancy Barto (collectively "Sabelko") are pro-life leafletters and "sidewalk counselors" who engage in activity outside abortion clinics in Phoenix. As sidewalk counselors they distribute literature and attempt to orally communicate the alternatives to abortion. After the passage of the ordinance, Sabelko curtailed her activities and speech because of fear of prosecution under the ordinance. Viewing the ordinance as an unconstitutional infringement of speech, Sabelko filed this action pursuant to 42 U.S.C. Sec. 1983 seeking declaratory and injunctive relief. The district court granted the injunction and declared the ordinance unconstitutional. The City of Phoenix timely appealed.
 
 II
 
 47
 The first step in any First Amendment inquiry is to determine whether the ordinance is content or viewpoint neutral. I agree with the court's opinion that the ordinance is content-neutral and I will not repeat that analysis. A content-neutral restriction on speech must be " 'narrowly tailored to serve a significant governmental interest, and ... leave open ample alternative channels for communication of the information.' " Ward v. Rock Against Racism, 491 U.S. 781, 791, 109 S.Ct. 2746, 2753, 105 L.Ed.2d 661 (1989) (quoting Clark v. Community for Creative Non-Violence, 468 U.S. 288, 293, 104 S.Ct. 3065, 3069, 82 L.Ed.2d 221 (1984)). Narrow tailoring requires that the means chosen do not "burden substantially more speech than is necessary to further the government's legitimate interests." Id., 491 U.S. at 799, 109 S.Ct. at 2758. More precisely, "[a] statute is narrowly tailored if it targets and eliminates no more than the exact source of the 'evil' it seeks to remedy." Frisby v. Schultz, 487 U.S. 474, 485, 108 S.Ct. 2495, 2503, 101 L.Ed.2d 420 (1987).
 
 
 48
 It is undeniable that the City of Phoenix's interest in protecting access to health care facilities is substantial. The government "has a strong interest in protecting a woman's freedom to seek lawful medical or counseling services in connection with her pregnancy." Madsen v. Women's Health Center, Inc., --- U.S. ----, ----, 114 S.Ct. 2516, 2526, 129 L.Ed.2d 593 (1994). On its face the ordinance appropriately seeks to protect the users of the facilities from "harassing or intimidating activity tending to impede ... access to those facilities," and the "adverse physiological and emotional effects" of the harassment. Although the City of Phoenix's interests are sufficiently substantial to support an appropriately tailored ordinance, Ordinance No. G3705 lacks such tailoring.
 
 
 49
 It is a touchstone of First Amendment jurisprudence that "[g]overnment may not regulate expression in such a manner that a substantial portion of the burden on speech does not serve to advance its goals." Ward, 491 U.S. at 799, 109 S.Ct. at 2758. The ordinance's consent provision does just that. Anybody in the area around the facility, whether they be a patient or otherwise, are free to effectively silence any speech they find objectionable by invoking the "bubble." The aims of the ordinance--to allow access, eliminate harassment and prevent intimidating activity--are served. But in so doing, the peaceful communicator expressing a protected viewpoint is also chilled.
 
 
 50
 Especially disturbing is the fact that the eight-foot bubble would prevent leafletting or handbilling. Once the bubble is invoked, it would be nearly impossible for any written communication to be distributed at any time. For example, an individual could immediately invoke the "bubble" once in the 100-foot buffer zone and prevent any handbilling on the sidewalks or streets that provide public access to the health care facility. Patient escorts acting in support of the facility could invoke the "bubble" preventing access to patients who may otherwise have at least glanced at the written materials before themselves invoking the "bubble." Although the First Amendment does not guarantee a willing listener or recipient, it does protect the "opportunity to win their attention." Kovacs v. Cooper, 336 U.S. 77, 87, 69 S.Ct. 448, 453, 93 L.Ed. 513 (1948). Strategic use of the "bubble" could eviscerate that opportunity.
 
 
 51
 Even more disturbing, the ordinance allows any person to invoke the "bubble." A number of people acting in concert can create a buffer around the facility exceeding eight feet and that would effectively prevent all peaceful communication. The entire 100-foot buffer zone could be turned into a no speech zone if a sufficient number of escorts occupied the zone and invoked the "bubble." The Supreme Court teaches that "[p]recision of regulation must be the touchstone" of any restriction on speech. The ordinance's broad sweep goes too far. NAACP v. Button, 371 U.S. 415, 438, 83 S.Ct. 328, 340, 9 L.Ed.2d 405 (1963) (citations omitted).
 
 
 52
 The City of San Jose in its amicus curiae brief focuses our attention on the threatening and harassing activity that the ordinance is designed to prevent. Harassment, threats and physical obstruction of clinics has long been subject to injunctive relief and Congress has now made such behavior criminal. Congress, addressing such concerns, passed the Freedom of Access to Clinic Entrances Act of 1994 (hereinafter "FACE"), 18 U.S.C. Sec. 248. The intentional use of force or physical obstruction to block clinic entrances is a crime. At least one circuit has concluded that FACE does not impede peaceful protesting traditionally protected by the First Amendment. See American Life League v. Reno, 47 F.3d 642 (4th Cir.) (upholding FACE as a content-neutral, narrowly tailored restriction on protected speech), cert. denied, --- U.S. ----, 116 S.Ct. 55, 133 L.Ed.2d 19 (1995). Unlike FACE, the Phoenix ordinance broadly sweeps at peaceful communication that lies at the core of the First Amendment.
 
 III
 
 53
 I end my discussion with Madsen. In Madsen, the Supreme Court considered an injunction imposed by a Florida court to prevent protesters from impeding access to a clinic. Concluding that an injunction is subject to a more stringent level of scrutiny then a content-neutral, generally applicable statute, the Court examined "each contested provision of the injunction to see if it burdens more speech than necessary to accomplish its goal." --- U.S. at ----, 114 S.Ct. at 2526. The injunction contained a variety of provisions restricting expressive activity by protesters outside the clinic. The City of Phoenix relies heavily on Madsen's conclusion that a 36-foot buffer zone established in the injunction burdened no more speech than necessary. The City of Phoenix argues that because the more burdensome 36-foot buffer zone was upheld under an even more stringent standard, Ordinance No. G3705 does not improperly infringe on speech. What the City fails to acknowledge is that the buffer zone was imposed in Madsen after the protesters continued to ignore court orders and impeded access to the clinic. Id. at ----, 114 S.Ct. at 2524. After repeated failures to protect the entrance to the clinic, the state court was left with no choice but to enforce a broader injunction to protect the government interests at stake.
 
 
 54
 Also included in the Madsen injunction was a provision that prohibited protesters from "approaching any person seeking the services of the Clinic unless such person indicates a desire to communicate." Id. at ----, 114 S.Ct. at 2516. Despite recognizing that protecting patients from being "stalked" or "shadowed" was a legitimate goal, the Court had little difficulty invalidating the provision, concluding that "[t]he 'consent' requirement alone invalidates this provision; it burdens more speech than is necessary to prevent intimidation and to ensure access to the clinic." Id. at ----, 114 S.Ct. at 2529. Madsen's consent provision is functionally indistinguishable from the one at issue here. In Madsen, all uninvited approaches were barred; here, all unwanted approaches are barred. The effect is the same; more speech than necessary is effectively silenced.
 
 
 55
 As the Court has often stated, and recently repeated in Madsen, " '[a]s a general matter, we have indicated that in public debate our own citizens must tolerate insulting, and even outrageous, speech in order to provide adequate breathing space to the freedoms protected by the First Amendment.' " Madsen, --- U.S. at ----, 114 S.Ct. at 2529 (quoting Boos v. Barry, 485 U.S. 312, 322, 108 S.Ct. 1157, 1164, 99 L.Ed.2d 333 (1988)). I believe that Phoenix Ordinance No. G3705 impermissibly encroaches on First Amendment freedoms and its enforcement should be enjoined.
 
 
 
 *
 Skip Rimsza, current Mayor of Phoenix, is substituted for former Mayor Paul Johnson
 
 
 [1]
 The ordinance provides:
 ORDINANCE NO. G3705
 AN ORDINANCE AMENDING CHAPTER 23, ARTICLE 1 OF THE PHOENIX CITY CODE, BY ADDING SECTION 23-10.1, RELATING TO UNIMPEDED ACCESS TO HEALTH CARE FACILITIES; AND DECLARING AN EMERGENCY.
 ___
 WHEREAS, unimpeded access to health care services is critically and uniquely important to the public health, safety and welfare; and
 WHEREAS, persons attempting to access health care facilities are subject to harassing or intimidating activity tending to impede their access to those facilities by demonstrators approaching within extremely close proximity; and
 WHEREAS, such activity near health care facilities creates a "captive audience" situation where persons seeking services cannot avoid the area outside the facilities, and their physical and emotional conditions may make them especially vulnerable to the adverse physiological and emotional effects of such harassing or intimidating activities directed at them from extremely close proximity; and
 WHEREAS, such activity in extremely close proximity tends to undermine a person's right to privacy and interfere with a person's right to seek legitimate health care treatment and counseling; and
 WHEREAS, this ordinance does not preclude all protesting, picketing, demonstrating, leafleting or educational activities near a health care facility but is a necessary time, place and manner restriction intended to reconcile and protect the First Amendment rights of demonstrators and the rights of persons using health care facilities to be free from direct confrontation, hindrance, harassment, intimidation and harm; and
 WHEREAS, existing law does not adequately protect such access to health care facilities; NOW THEREFORE,
 BE IT ORDAINED by the Council of the City of Phoenix as follows:
 SECTION 1. Chapter 23, Article 1, Phoenix City Code, is amended by adding section 23-10.1 to read:
 Sec. 23-10.1 IMPEDING ACCESS TO HEALTH CARE FACILITIES.
 A. It is unlawful for any person, in the course of demonstration activity within the access area of a health care facility, to fail to withdraw upon a clearly communicated request to do so to a distance of at least eight (8) feet away from any person who has made the request.
 B. For purposes of this section:
 
 
 [1]
 "Access area" means any portion of a public street or other public place or any place open to the public within one hundred (100) feet of an exterior wall or entryway of a health care facility
 
 
 [2]
 The plain terms of the ordinance contradict the district court's assertion that it restricts only certain kinds of speech. The ordinance does not limit its reach to "oral protest, education [and] counseling;" it merely lists them among the activities it regulates under the rubric of "demonstration activity," and it states explicitly that "[f]or purposes of this section ... demonstration activity ... is not limited to" these activities
 
 
 [3]
 Plaintiffs' contention that the ordinance improperly vests discretion in private citizens to curtail speech is likewise insupportable. The cases they cite are concerned only with discretion vested in agents of the government. Like the Colorado Court of Appeals, which recently considered an even stricter ordinance, we know of no authority "that would extend this doctrine to limit the right of a private citizen to determine whether to permit others to confront [her] concerning medical ... treatment." Hill v. City of Lakewood, No. 94CA0856, 1995 WL 411983, * 4 (Colo.App.) (upholding ordinance forbidding uninvited approaches to within eight feet of a person less than 100 feet away from entrance to a health care facility)
 
 
 [1]
 Protected by the privilege of the Speech or Debate Clause, U.S. Const. art. I, Sec. 6, the remarks of several Senators are reported in the Congressional Record, 141 Cong.Rec. S8862-63 (daily ed. June 22, 1995)
 Mr. SMITH.
 In illustration No. 4, the abortionist takes a pair of scissors and inserts the scissors into the back of the skull and then opens the scissors up to make a gap in the back of the skull in order to insert a catheter to literally suck the brains from the back of that child's head.
 That is what happens in the so-called partial-birth abortion.
 Ms. MOSELEY-BRAUN.
 The extreme agenda, I think, is pretty evident. I have never seen anything as horrific, as horrendous, as awful, as ugly and graphic as the posters and the doll figure I saw on the floor a few minutes ago. It is outrageous to bring something like that on the floor of the U.S. Senate to make whatever point. Whether you are for or against choice, to bring that kind of graphic depiction of ugliness on this floor, I think, only serves the purpose of inflaming people around an issue that really inflames and divides the American people, and that does go to the heart of the opposition's extreme agenda here.